Richard SCHMIDT and Craig Taylor, Appellants,

v.

The BOARD OF EDUCATION OF RAYTOWN CONSOLIDATED SCHOOL DISTRICT NO. 2, Raytown, Missouri, Respondent.

No. WD 37669.

Missouri Court of Appeals, Western District.

June 17, 1986.

Larry A. Schaffer, Burmeister, Schaffer & McIntosh, Independence, for appellants.

Norman Humphrey, Jr., Humphrey, Farrington, Prins & McClain, Independence, for respondent.

Before SHANGLER, J.P., and DIXON and LOWENSTEIN, JJ.

DIXON, Judge.

Richard Schmidt and Craig Taylor appeal from the determination by the Board of Education of Raytown Consolidated School District No. 2 that they should be discharged as teachers because of immoral conduct.

The issue is whether the evidence is sufficient to support the Board of Education's determination.

Before stating the relevant facts, the scope of review should be stated and the teachers' misapprehension of this court's function corrected. The teachers contend that the decision of the Board of Education is in violation of § 536.140.2(3), (6), (7), RSMo 1978, which reads in relevant part as follows:

> 2. The inquiry may extend to a determination of whether the action of the agency
>
> . . . .
>
> (3) Is unsupported by competent and substantial evidence upon the whole record;
>
> . . . .
>
> (6) Is arbitrary, capricious, or unreasonable;
>
> (7) Involves an abuse of discretion.

During oral argument and to some extent in the briefs, the teachers have focused on the factual determination by the Board. The teachers strongly urge that the Board decision is wrong upon the evidence presented. It is not for this court to determine whether these teachers should or should not be terminated. This court does not weigh the evidence and decide the merits of the case. The decision whether to terminate the teachers and the weighing of the evidence on that issue are committed to the Board of Education. The function of this court on a factual review is to determine whether there is substantial competent evidence in the record to support the decision of the Board of Education. *Perez v. Webb,* 533 S.W.2d 650, 654 (Mo.App. 1976); *Kimble v. Worth County R–III Board of Education,* 669 S.W.2d 949, 953 (Mo.App.), *cert. denied,* —— U.S. ——, 105 S.Ct. 331, 83 L.Ed.2d 268 (1984); *Osage Outdoor Advertising, Inc. v. State Highway Commission,* 687 S.W.2d 566, 568 (Mo.App.1984).

The facts in this case are largely drawn from the teachers' recital of the events to Dr. Paul R. Graff, Principal of Raytown High School. Dr. Graff was the primary witness for the Board at the hearing. The two teachers involved taught at Raytown High School in the Consolidated School District No. 2, Raytown, Missouri, and served as coaches for the boys' wrestling team. Richard Schmidt was the head coach and Craig Taylor was his assistant. The teachers took six high school students to the State Wrestling Meet in Columbia, Missouri. Four of these boys competed in the tournament and all six of the boys stayed at a motel in Columbia under the teachers' authority.

Four female students and one adult female chaperone, the mother of one of the students, were also present in Columbia for the State Wrestling Meet. The female students were cheerleaders for the wrestling team during the year, but were not officially acting as cheerleaders at the tournament.

After a late dinner on the evening of February 8, 1985, the teachers and the female chaperone of the cheerleaders went to a lounge in the motel for a drink, leaving the wrestlers and cheerleaders unsupervised in two adjoining motel rooms. During the time the teachers were absent from the rooms, another instructor reported that

he had been in the rooms and found nothing amiss. The female students were staying at another motel west of Columbia. Later in the evening, the teachers and the female chaperone left the motel and went to another area of Columbia to attend a private party where they all drank alcoholic beverages. They checked on the students before leaving. At some point during the time that the students were unsupervised, four members of the wrestling team left the motel room and traveled by automobile to another motel in the Columbia area to visit the parents of one of the students. They returned some time later and rejoined the other students, male and female, at the motel. The teachers were, of course, unaware of the excursion.

At some time while the students were in the adjoining rooms, third parties brought beer into one of the motel rooms and consumed a portion of the beer. The students did not drink any of the beer and the teachers, one of whom was in the adjoining room, were unaware of the incident.

The teachers and female chaperone returned to the motel rooms at approximately 1:30 a.m. When they were unable to arouse the sleeping cheerleaders, a decision was made by the teachers to allow the female chaperone and the female students under her supervision to continue to sleep in the motel rooms with the teachers and the male students. The teachers advanced evidence to show that that decision was made because the hour was late, the weather was bad, the female chaperone was not familiar with the vehicle she was driving and she had been drinking. After this decision was made, Schmidt and the female chaperone proceeded to occupy one of the beds in one of the motel rooms while Taylor and one of the female students occupied the other bed in that same room. Also in that same room were two members of the wrestling team and one other female student, all of whom slept on the floor. The remaining students apparently slept in the other motel room without supervision. No one was unclothed and there is no evidence of sexual misconduct. No effort was made by the teachers to segregate the sexes into separate motel rooms even though two rooms were available for the group. Schmidt was married while Taylor was single.

The next day, February 9th, while still in Columbia, it was agreed by the students, female chaperone, and the teachers not to discuss the activities of the previous evening with anyone, including parents or the administrators of the School District.

Dr. Graff, the immediate superior of the teachers, initially learned of the incident on March 8, 1985, a month after the events. Dr. Graff met with Schmidt on the following day, March 9, 1985, and Schmidt gave a statement to Dr. Graff at that time which essentially consisted of the facts just related. Dr. Graff interviewed Taylor on March 10, 1985. Taylor also made a statement which conformed to the facts just related. After some further investigation, Dr. Graff determined that the actions of the teachers were, in fact, immoral in character rendering them unfit to teach in the Raytown schools, and recommended to Dr. Robert B. Atkin, Superintendent of Schools, that Schmidt and Taylor be terminated as teachers in the Raytown School District.

On March 19, 1985, after a meeting of the Board, a letter was sent to each of the teachers informing them that they were being suspended with pay and benefits and indicating that the Superintendent had filed charges against them that might result in their termination as teachers with the School District. Also on that day, statements of charges were sent to Schmidt and Taylor.

At the time of the hearing, a report to Dr. Atkin from Dr. Graff dated March 14, 1985, which outlined the circumstances of Dr. Graff's investigation of the incident and his recommendation of termination, was received into evidence. A copy of the policy of the Board of Education of Consolidated School District No. 2 pertaining to teacher contracts and termination of the same was also admitted. Neither document was objected to by the teachers.

Findings of fact, conclusions of law, and orders of termination were prepared by the Board and furnished to the teachers. The conclusions of law were that the teachers, because of their actions and inactions as outlined in the findings of fact, conducted themselves immorally under the terms of § 168.114.1(2), RSMo 1978. Because the immoral conduct adversely affected their performances as teachers and coaches in the School District, their contracts with the School District should be terminated.

The teachers contend that the Board's determination that the teachers' "immoral conduct rendered [them] unfit to teach" was:

a) unsupported by competent and substantial evidence, and

b) was arbitrary and capricious and,

c) involved an abuse of discretion.

The teachers *do not* contest the Board's finding of immoral conduct. They concede that none of the stated deficiencies of lack of evidentiary support, arbitrary and capricious action, or abuse of discretion are directed to the findings of immoral conduct. The teachers confine these attacks to the finding of "unfitness to teach."

The teachers preface their argument by asserting that *Thompson v. Southwest School District,* 483 F.Supp. 1170 (W.D. Mo.1980), and *Ross v. Robb,* 662 S.W.2d 257 (Mo. banc 1983), have construed the phrase "immoral conduct," appearing in § 168.-114.1(2), RSMo 1978 as a ground for termination, to mean "conduct rendering plaintiff unfit to teach." *Thompson,* 483 F.Supp. at 1181; *Ross,* 662 S.W.2d at 259. They continue their argument by asserting that there must be *evidence* to support a *finding of fact* that the immoral conduct rendered the teachers unfit to teach.

Even accepting the argument at face value, it fails in this case. Dr. Graff testified that in his opinion the conduct of the teachers rendered them unfit to teach. That testimonial evidence is attacked as being less than substantial because the opinion was couched in such phrases as "guess," "think," and "believe." As the Board concedes, Dr. Graff's testimony was not "an overpowering example of articulation." Nonetheless a fair reading of his testimony affords a factual basis for the finding by the Board. Dr. Graff's written report, which explicitly and without equivocation made the assertion that the conduct rendered the teachers unfit, was in evidence without objection.

Moreover and more importantly, the premise of the argument is overly broad. There is no doubt that *Robb,* citing *Thompson,* construed the term immoral conduct to mean immoral conduct rendering the teacher unfit to teach. *Robb,* 662 S.W.2d at 259. The *Robb* opinion adds no requirement that there be evidence of or a specific separate finding of *"unfitness to teach."* What *Robb* requires is that there be some nexus between the immoral conduct shown in the evidence and fitness to teach. Obviously, some forms of immoral conduct may by their very nature demonstrate unfitness to teach. Child molestation comes to mind as an example. Other conduct may less obviously affect the ability or fitness to teach. In those cases there may be a need to present evidence explicating the effect of such conduct and to provide a predicate for applying the statutory language to the facts of the case. All that *Robb* requires is that the term immoral conduct not be construed so broadly that it becomes subject to attack as being void for vagueness.

The teachers' attack on the Board's finding that it was arbitrary and capricious as well as an abuse of discretion must also fail. The contention as to both is that only Dr. Graff's evidence supported a finding of unfitness to teach and that many witnesses testified to the contrary. Without citation of authority, the teachers assert that this imbalance of testimony makes the Board's findings arbitrary and capricious. Much is made of the fact that twenty-four witnesses spoke for the teachers' retention, six of whom addressed the fitness to teach issue specifically. Reference is also made to the teachers' past records. The contention is no more than an argument addressed to the trier of fact, which we are not.

The teachers argue that comparison of the evidence in *Thompson* and in this case requires the instant case be reversed. *Thompson* is factually inapposite; the conduct in the instant case was in "public" and occurred while the teachers were acting in their capacity as teachers—facts completely absent from *Thompson*.

The findings and conclusions of the Board and the circuit court judgment are affirmed.

All concur.